**TIMOTHY A. SCOTT**
California Bar No. 215074
**MICHELE A. MCKENZIE**
California Bar No. 209657
**NICOLAS O. JIMENEZ**
California Bar No. 295057
SINGLETON SCHREIBER McKENZIE & SCOTT, LLP
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 780-5641
Facsimile: (619) 780-5641
Email: tscott@ssmsjustice.com
        mmckenzie@ssmsjustice.com
        njimenez@ssmsjustice.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE PAZOS,<br><br>                          Plaintiff,<br><br>v.<br><br>TUNGSTEN HEAVY POWDER, INC., d/b/a TUNGSTEN HEAVY POWDER AND PARTS, INC.; TUNGSTEN PARTS WYOMING, INC.; JOSEPH SEROV a.k.a. JOSEPH SERY; RUSSELL LEWIS; JOHN-PATRICK BATACHE;<br><br>                          Defendants. | Case Number: **'21CV1140 L    AGS**<br><br>**COMPLAINT FOR:**<br><br>**(1) RETALIATION IN VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h);**<br><br>**(2) WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY;**<br><br>**(3) DEFAMATION PER SE.**<br><br>**DEMAND FOR JURY TRIAL** |

## I.    Introduction.

1. Plaintiff George Pazos brings this action following his retaliatory termination for reporting and refusing to engage in the illegal activities committed by defendants Tungsten

1

Heavy Powder, Inc., Tungsten Parts Wyoming, Inc., Joseph Serov, Russell Lewis, and John-Patrick Batache against the United States and its private military contractors. Defendants fired Plaintiff after he reported and sought to remedy their numerous serious statutory and regulatory violations in the manufacture of military components. After illegally terminating Plaintiff, Defendants then defamed him by falsely telling defense industry contacts and law enforcement authorities that Plaintiff was a "thief" and "criminal," and continue their pattern of retaliation and harassment to this day.

Plaintiff requests a jury trial to pursue justice on these claims.

## II.  Parties.

2.  Plaintiff George Pazos is a citizen of the United States and a resident of the County of San Diego.

3.  Defendant Tungsten Heavy Powders, Inc., doing business as Tungsten Heavy Powder & Parts, Inc., (hereinafter "THP") is a California corporation with its principal place of business at 6170 Cornerstone Court East, Suite 310, San Diego, California, 92121.

4.  On information and belief, defendant Tungsten Parts Wyoming (hereinafter "TPW") is a subsidiary of THP and a Delaware corporation with its principal place of business at 1665 Venture Drive, Laramie, Wyoming, 82070.

5.  On information and belief, defendant Joseph Serov a.k.a. Joseph Sery is a citizen of the United States and a resident of either San Diego or Wyoming. At all times relevant to this Complaint, defendant Serov was the co-owner and former Chief Executive Officer ("CEO") of THP and TPW.

6.      On information and belief, defendant Russell Lewis is a citizen of the United States and a resident of the state of Nevada. At all times relevant to this Complaint, defendant Lewis was the co-owner of THP and TPW.

7.      On information and belief, defendant John-Patrick Batache is a citizen of the United States and a resident of Wyoming. At all times relevant to this Complaint, defendant Batache was the CEO of TPW and is the current CEO of THP and TPW.

## III.    Jurisdiction & Venue.

8.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730(h).

9.      This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a), as at least one defendant can be found in, resides in, transacts business in, and committed acts related to the allegations in this Complaint in the Southern District of California. At all times relevant to this complaint, Defendants conducted extensive business in the Southern District of California, shipped and received goods through the Southern District of California, had offices, property, bank accounts, and employees in the Southern District of California, and generally availed themselves of the laws of California.

10.     Venue is proper in this Court, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c), as at least one of the Defendants to this action can be found in, resides in, and transacts business in the Southern District of California, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

**IV.    Factual allegations.**

    **A. Defendants' business involved the manufacturing of military components, which is subject to an extensive statutory and regulatory scheme.**

11.    Defendants Joseph Serov (a.k.a. Joseph Sery) and Russell Lewis are the co-owners of THP and TPW.

12.    THP claims to be a "supplier of tungsten and moly products for military, industrial engineering, and medical markets worldwide for the past 20 years."

13.    THP states that it is a "major supplier of military fragments worldwide, along with fragment sub-assemblies, buffers, penetrators of all kinds, aluminum sabots and tails as well as various tungsten alloy rods."

14.    In the August 2015 edition of Army magazine, THP stated that it was "the largest supplier of military fragments and military subassemblies in the world."

15.    According to THP's website, "[t]he company's customers include: US Army, Air Force, and Navy; Lockheed Martin; Orbital ATK; Israeli Military Industries; BAE Systems; Nammo; General Dynamics; Leidos; major national laboratories; Boeing; Halliburton; Snap-On; major airlines; Adidas and so many more."

16.    At all times relevant herein, THP maintained its headquarters in San Diego, California.

17.    At all times relevant herein, THP employed numerous people at its San Diego headquarters.

18.     On information and belief, at all times relevant herein, Defendant Serov maintained a residence in San Diego and was based out of THP's offices in San Diego.

19.     TPW, which calls itself "The Silent Giant in the Tungsten Industry", is on information and belief a subsidiary of THP and operates a manufacturing facility in Laramie, Wyoming.

20.     TPW's product catalog (www.tungstenparts.com/about_tpw.html) redirects to THP's website and product catalog (www.tungstenheavypowder.com/shopping).

21.     The current CEO for both companies is Defendant John-Patrick "JP" Batache.

22.     The former CEO for both companies was Defendant Serov.

23.     Defendant Russell Lewis was, and on information and belief remains, a co-owner for both companies.

24.     TPW claims on its website that "this modern facility combines cutting edge technology and equipment to produce high-quality tungsten parts."

25.     TPW claims on its website that it serves "all the largest corporations in the industry," including Northrop Grumman, Lockheed Martin, General Dynamics, Boeing, and the Department of the Army.

26.     TPW claims on its website that it "is proud of the fact that parts that were once made in China are now being made by Americans in the company's Laramie, Wyoming plant."

27.     TPW further claims on its website that it "takes pride in American workmanship and jobs" and that it "values goods that are 'made in the U.S.A.'"

28.     At all times relevant herein, Defendants held themselves out to the United States Department of Defense, the Department of the Army, and to private contractors, as a manufacturer of military components.

29.     At all times relevant herein, Defendants represented to the United States and private defense contractors engaged in business with the United States, that they complied with all applicable laws, rules, and regulations for the manufacturing of military components.

30.     At all times relevant herein, Defendants made claims for contract payments to the Department of Defense in which they represented and certified adherence to all applicable law, rules, and regulations.

31.     Defendants were required to comply with the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130.

32.     ITAR restricts and controls the import and export of defense and military related articles and services on the United States Munitions List (USML) in order to safeguard the national security and foreign policy objectives of the United States.

33.     The United States Department of State's Directorate of Defense Trade Controls (DDTC) is responsible for administering ITAR.

34.     According to 22 C.F.R. § 122.1, any person who engages in the United States in the "business of manufacturing or exporting or temporarily importing defense articles… is required to register with the Directorate of Defense Trade Controls under §122.2."

35.     Articles, services, and related technical data that are designated as defense articles or defense services pursuant to sections 38 and 47(7) of the Arms Export Control Act ("AECA"), 22 U.S.C. 2751, *et. seq,* constitute the USML and are ITAR controlled.

36.     Pursuant to the ITAR, an "export" includes:

    a.  An actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner. *Id.* at § 120.17(a)(1);

    b.  Releasing or otherwise transferring technical data to a foreign person in the United States (a "deemed export"). *Id.* at § 120.17(a)(2); and

    c.  Releasing technical data to a foreign person in the United States is deemed to be an export to all countries in which the foreign person has held or holds citizenship or holds permanent residency. *Id.* at § 120.17(b).

37.     Under the ITAR, "technical data" means information which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. *Id.* at § 120.10(1).   This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation. *Id.* "Technical data" also means classified information relating to defense articles and defense services on the U.S. Munitions List. *Id.* at § 120.10(2).

38.     Any person who intends to export a defense article must obtain the approval of the DDTC prior to the export, unless the export qualifies for an exemption under the ITAR. *Id.* at § 123.1.

39.     A DDTC license is required for the export of technical data, including exports to foreign persons for offshore procurement of defense articles. *Id.* at §§ 124.13, 125.2(a).

40.     A DDTC license is required for the oral, visual, or documentary disclosure of technical data by U.S. persons to foreign persons.  *Id.* at § 125.2(c).  A license is required regardless of the manner in which the technical data is transmitted (e.g., in person, by telephone, correspondence, electronic means, etc.). *Id.*

41.     It is the policy of the United States to deny licenses and other approvals for exports and imports of defense articles and defense services, destined for or originating in certain countries. *Id.* at § 126.1(a).  For defense articles, DDTC has a policy of denial of licenses when the export relates to China. *Id.* at § 126.1(d)(1).

42.     No sale, export, transfer, reexport, or retransfer of, and no proposal or presentation to sell, export, transfer, reexport or retransfer, any defense articles may be made to China, or to any person acting on its behalf, whether in the U.S. or abroad, without first obtaining a license or written approval of the DDTC. *Id.* at § 126.1(e)(1).

43.     In addition to the ITAR requirements, on information and belief, flow-through provisions between Defendants and their private contractor customers stated that: "Supplier shall certify that no technical data will be transferred to foreign nationals or foreign countries per PO code 18QCCP."

44.     Defendants were required to comply with ITAR because the tungsten parts that they purportedly manufactured included "defense articles" withing the meaning of those statutes and regulations.

45.     As such, Defendants were required by ITAR to obtain approval from the DDTC before any of their employees or agents could export technical data to or share technical data with a foreign person who is in the United States or in a foreign country, unless Defendants certified that the proposed export or sharing of technical data was exempt from ITAR's licensing requirements.

46.     A foreign person in the United States who has permanent resident alien status (a green card) is treated as if he or she is a U.S. citizen under ITAR.  However, if that foreign person is in the United States and does not have permanent resident alien status, that person is a foreign person for purposes of ITAR. That includes foreign individuals present in the U.S. on an H1B visa, a business visa, a student visa, or no visa.

47.     ITAR expressly prohibits "actual shipment[s] or transmission[s] out of the United States, including the sending or taking of . . . defense article[s] out of the United States in any manner," and the "[r]eleas[e] or . . . transfer [of] technical data to a foreign person in the United States." 22 C.F.R. § 120.17(a).

48.     Additionally, some of Defendants' products, including, but not limited to, tungsten spheres, cubes, and penetrators fall under "Category III: Ammunition/Ordnance" on the USML. 22 C.F.R. § 121.1.

49.     Category III of the USML states the following: "The components, parts, accessories and attachments controlled in this category include, but are not limited to, cartridge cases, powder bags (or other propellant charges), bullets, jackets, cores, shells (excluding shotgun shells), projectiles (including canister rounds and submunitions

therefor), boosters, firing components therefor, primers, and other detonating devices for the defense articles controlled in this category." *Id*. at (f)(1) (emphasis added).

50.     Section 1211(a) of the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136, 3461, 10 U.S.C.A. imposes on the Department of Defense a prohibition against the acquisition of USML items from Communist Chinese Military Companies.

51.     In order to implement section 1211 of the National Defense Authorization Act for Fiscal Year 2006, the Department of Defense issued a rule amending the Defense Federal Acquisition Regulation Supplement ("DFARS") effective September 8, 2006. 71 FR 53045.

52.     The DFARS rule states the following: "Do not acquire supplies or services covered by the United States Munitions List (USML) (22 CFR part 121), through a contract or subcontract at any tier, from any Communist Chinese military company. This prohibition does not apply to components and parts of covered items unless the components and parts are themselves covered by the USML." 48 C.F.R. § 225.770-2 (emphasis added).

53.     "Communist Chinese military company" means any entity that is: (1) part of the commercial or defense industrial base of the People's Republic of China; or (2) owned or controlled by, or affiliated with, an element of the Government or armed forces of the People's Republic of China.  22 C.F.R. § 252.225-7007.

54.     To effectuate that prohibition, DFARS requires the following clause to be included in solicitations and contracts involving the delivery of items covered by the USML:

"Prohibition On Acquisition of United States Munitions List Items From Communist Chinese Military Companies (SEP 2006) … (b) Any supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, directly or indirectly, from a Communist Chinese military company." § 252.225-7007 (emphasis added).

55.     The specialty metal clause prohibits the Department of Defense from acquiring end units or components for aircraft, missile and space systems, ships, tank and automotive items, weapon systems, or ammunition unless these end items or components have been manufactured with specialty metals that have been melted or produced in the United States. 48 CFR § 252.225-7009.

56.     A "commercially available off-the-shelf item" is a commercial item sold in substantial quantities in the commercial marketplace offered to the Federal Government, without modification, in the same form in which it is sold in the commercial marketplace; but does not include bulk cargo. 41 U.S.C. § 104.

57.     Tungsten spheres do not qualify as "commercially available off-the-shelf items."  The Active Standard for tungsten base, high-density metal, ASTM B777, only specifies nominal tungsten used of 92.5 percent; it does not specify the percentage of iron or nickel to be put into the spheres.  In other words, the tungsten spheres were specially made based on the request from customers and were therefore not sold in the same form in which they are sold in the commercial marketplace.

58.     Defendants were also subject to the regulations that apply to contracts involving Foreign Military Financing ("FMF").

59.     The AECA authorizes the President to finance procurement of defense articles and services for foreign countries and international organizations.   The purpose of the AECA is to support "effective and mutually beneficial defense relationships in order to maintain and foster the environment of international peace and security essential to social, economic, and political progress." 22 U.S.C. § 2751.

60.     Funds that are granted to finance the procurement of U.S. defense articles for foreign partner nations are known as Foreign Military Financing.  The State Department determines to assign FMF programs to designated countries, and the DoD executes the program.

61.     The DoD, through Directive 5105.65, established the Defense Security Cooperation Agency.   The Defense Security Cooperation Agency Guidelines ("DSCA Guidelines") contain the procedural, policy, and legal requirements governing the operation of FMF programs.

62.     DSCA Guidelines govern the processing and review of commercial contracts for direct purchase of U.S. defense articles and services from U.S. firms to be financed with funds appropriated by Congress. *See* DSCA Guidelines Overview, at pg. 1.   Foreign governments use direct commercial contracts ("DCC") to acquire defense articles directly from a U.S. company, rather than through the U.S. Government pursuant to a Letter of Offer and Acceptance. *Id.*

63.     A limited number of foreign countries, including Israel, are authorized by law to finance their DCCs with FMF. *See* DSCA Guidelines Overview, at pg. 1, footnote 1.

64.     To be eligible for an FMF grant, the prime contractor is required to adhere to the following requirements, *inter alia*, stipulated in the DSCA Guidelines:

a.     The prime contractor must be a U.S. supplier, manufacturer, reseller, or distributor incorporated or licensed to do business in the United States. *Id.* at § 1.

b.     Purchase agreements are made directly with the manufacturer of the defense article or service provider, if possible. The prime contractor is required to **add value to the product being sold.** *Id.* at § 2.

c.     Purchases of material are made, to the maximum extent feasible, from the prime manufacturer, or assembler, or from a U.S.-based distributor or reseller of a manufacturer or assembler pursuant to a preexisting contractual or licensed relationship. *Id.* at § 2(A).

d.     The prime contractor must demonstrate to DSCA its capability – e.g., expertise, experience, infrastructure, and financial soundness – to perform by itself **a substantial portion of the work.** *Id.* at § 2(B).

e.     FMF **may not be used to compensate a procurement agent, broker, import-export firm or other intermediary unless justified by unique factors** relating to the specific country needs and the country's abilities to conduct commercial contracting. *Id.* at § 2(D).

13

65.     Section 42 of the AECA requires the United States government to emphasize procurement in the United States when carrying out provisions under the Act. *Id.* at § 6. Accordingly, in order for a DCC to be approved for FMF funding, the defense articles purchased must be (i) **manufactured and assembled in the United States**, or the defense services purchased must be performed by U.S. manufacturers or suppliers and (ii) purchased from U.S. manufacturers or suppliers. *Id.* Absent an applicable exception or approved offshore procurement waiver, **FMF funding may be used only to pay for the cost of the U.S. content portion of items or services that consist of a mix of U.S. and non-U.S. content.** *Id.* For this reason, prime contractors must accurately account for the cost of U.S. and non-U.S. content of items and services sold pursuant to a DCC. *Id.*

66.     A prime contractor must account for the value of all U.S. and non-U.S. content costs for the prime contractor's material, labor, and all other expenses to produce or provide the item or service. *Id.* at § 6(A).

67.     The DSCA Guidelines provide the following example:

Example 1: A Company manufactures and sells a forklift for $20,000. In producing the forklift, the Company imports $2,000 worth of parts and materials from non-U.S. subcontractors. When the Company completes its DCC contractor certification, the Company must report the value of non-U.S. content in its forklift as $2,000. *Id.*

68.     The prime contractor must account for an item or material purchased from a first-tier subcontractor as either 100 percent U.S. content or 100 percent non-U.S. content. *Id.* at § 6(C).

69.     An item purchased from a first-tier subcontractor will constitute 100 percent U.S. content if the subcontractor's item was (1) manufactured in the United States; and the (2) subcontractor's domestic costs equals or exceeds 51 percent of the total item's cost. *Id.* at § 6(C)(1).  In order to consider a First Tier Subcontractor's costs as U.S. costs, the Prime Contractor must obtain a signed certification from the first-tier subcontractor attesting to the aforementioned facts. *Id.*

70.     An item purchased from a first-tier subcontractor will constitute 100 percent non-U.S. content if the subcontractor's item was purchased from a non-U.S. company or the U.S. company subcontractor does not provide the Prime Contractor with a signed certification. *Id.* at § 6(C)(2).

71.     If a prime contractor is unable to obtain a First-Tier Subcontractor U.S. Content Certification or other written factual assertion concerning content of the First-Tier Subcontractor's product from its First-Tier Subcontractor, the prime contractor must presume that 100 percent of the cost of the item from the First-Tier Subcontractor constitutes non-U.S. content.  *Id.* at § 6(C)(3).

72.     In rare cases, pursuant to Section 42(c) of the AECA, a purchaser may request DSCA process an offshore procurement waiver to use FMF for the purchase of non-U.S. content. *Id.* at § 7.  An offshore procurement waiver is only permissible when there has been an Executive Branch determination that such procurement will not result in adverse effects upon the U.S. economy or the industrial mobilization base. *Id*

**B. Defendants violated their legal obligations regarding the manufacturing of military components and repeatedly submitted false claims to the United States.**

73.   Despite claiming that its primary business is the manufacturing of military components, and knowing about these extensive statutory and regulatory requirements, Defendants repeatedly made claims to the United States in which they misrepresented their compliance with the regulations detailed in the previous section. Defendants' statutory and regulatory violations included:

**a. Defendants provided access to ITAR-controlled materials to foreign nationals.**

74.   Defendants allowed a foreign person, Dror Sery, defendant Serov's brother and an Israeli national, to have access to their secure "Sharefile" system, the system by which Defendants' employees could share and view electronic files containing product information regarding defense articles that were subject to ITAR.

75.   On one occasion, Dror Sery sent an email to several of the companies' employees, including defendant Serov, stating that he would send a customer's ITAR-controlled intellectual property to a company in China that manufactures balancing machines.

76.   Additionally, on at least one occasion, defendant Serov emailed Dror Sery several DSG Technology drawings, information regarding those drawings, and similar drawings made by defendant Serov. DSG is a company that manufactures ammunition. The

drawings depicted the DSG 5.56-DCC, also known as the Cav-X penetrator, a defense article subject to ITAR.

77.     On information and belief, THP and TPW were required to apply for and receive a Technical Data License issued by the DDTC for Dror Sery for each specific defense article, product or component before he could access drawings, prints, manufacturing processes or technical data related to each specific defense article, product or component that is subject to ITAR.

78.     On information and belief, the application for a Technical Data License required Defendants to obtain permission from their customers before a foreign person may have access to any defense article, product or component manufactured by Defendants for said customers.

79.     On information and belief, Defendants repeatedly failed to obtain Technical Data Licenses for Dror Sery before providing him access to ITAR-controlled materials.

80.     On information and belief, Dror Sery accessed and shared ITAR-controlled materials despite having no permission or authority from the DDTC or any of Defendants' customers to access or share that information.

81.     Moreover, in March 2019, Dror Sery was provided an office at TPW, where he had full access to Defendants' ShareFile system. On information and belief, Dror Sery possessed a laptop computer that had administrative access to every file on Defendants' ShareFile system, including when he was off company premises and in Israel.

82.     Further, as a normal business practice, Defendant Serov directed employees to remove or "block out" ITAR-restricted designations from forms in order to ship outside of the country.

83.     Certain items listed on the Export Administration Regulation's ("EAR") Commerce Control List ("CCL") are classified as "dual-use" according to regulatory and national security goals. CCL-designated items are assigned an Export Control Classification Number ("ECCN") based on the item's dual-use technical capabilities.

84.     Items subject to the EAR that are not listed under an ECCN are classified as "EAR99." As a normal business practice, defendant Serov directed employees to use "EAR99" designations when exporting shipments to evade government scrutiny. Since Defendants' products fall under the jurisdiction of ITAR, an EAR99 designation was improper.

85.     Defendant Serov would direct Defendants' Order Management Specialist, Jinglin "Yolanda" Gong, to send ITAR-restricted drawings to Defendants' suppliers in China.

86.     On information and belief, Defendant Serov would order Ms. Gong to remove or block out the ITAR designations on the drawings.

87.     On information and belief, Defendants also exported defense articles to Mexico without a DDTC license. Defendants would ship tungsten cubes and assembly equipment to factories in Mexico for assembly.

88.     On information and belief, Defendants provided technical data to these Mexican factories without a DDTC license.  When Defendants sent assembly instructions to the factories, it was often necessary to provide drawings related to the defense articles. Defendants would provide the drawings (technical data) without securing a DDTC license and with ITAR-designations blocked out.

89.     Defendants employed non-U.S. citizens (from Venezuela and Mexico) who had access to technical data and ITAR-controlled materials and did not secure DDTC licenses for any of them.

90.     Further, on information and belief, in 2018 and 2019, Defendants purchased tungsten products, including tungsten cubes, balls, and plates, from Xi`an Refractory & Precise Metals, Ltd, located in Xi`an, China, and from Beijing Tian-Long Tungsten & Molybdenum Co., in Beijing, China.

91.     On information and belief, these companies were part of the commercial or defense industrial base of China.

92.     On information and belief, Defendants would verbally instruct their employees to remove all labeling and markings from any packaging that arrived from China.

93.     On information and belief, in 2018 and 2019, Defendants would then "sell" the Chinese made tungsten products, including tungsten cubes, balls, and plates through THP to Orbital ATK, IMI, Northrup Grumman, General Dynamics and other customers.

94.     On information and belief, IMI, Northrup Grumman, General Dynamics, and Defendants' other customers were not informed or made aware that Defendants were selling

them foreign made defense articles from China, rather than products that Defendants represented were manufactured in the United States by Defendants.

95.     Defendants engaged in other behaviors to conceal the Chinese origin of their defense articles.

96.     Defendants would take a sample of Chinese tungsten spheres—U.S. Pre-certified chemical analysis tungsten spheres that they kept on the premises—and would send those out to an independent chemistry laboratory in San Diego for testing and analysis certification as a false substitute for a sample from a shipment of tungsten spheres received from a Chinese manufacturer.

97.     Defendants were only required to send a sample of the spheres, which they would assert had been randomly selected from the manufactured batch contained within the shipment received from a Chinese manufacturer.  In so doing, Defendants would cause the "independent" report to misrepresent to the customer that the batch of tungsten spheres was compliant.

98.     Defendant Serov would direct personnel to repackage the tungsten spheres that arrived in San Diego from the Chinese barrels with Chinese markings from the Chinese manufacturer into a different barrel.

99.     Further, Defendants would direct their employees to translate the tungsten certification and specifications from Chinese into English to certify as being submitted to in-house testing and analysis.

100.    Defendants' contracts with the United States and private defense contractors required a certification of compliance with ITAR.

101.    Additionally, Defendants certified to the DDTC that they would "seek license authorization if a direct hardware export" became necessary.

102.    At all times relevant herein, Defendants failed to obtain the required DDTC licenses, misrepresented to the United States and private contractors that their products complied with ITAR, and repeatedly submitted claims to the United States containing these false representations.

### b.  FMF fraud.

103.    Defendants also engaged in violations of their FMF obligations.

104.    Defendants entered into a two-phase contract with the Israeli government in 2016. The purpose of the contract was to supply necessary parts for Israeli ammunition.

105.    The second phase of the project was funded under the FMF.

106.    This phase involved the supply of the following items for the ammunition:

a.    31,000 Heavy Cubes Unit ASSY;

b.    21,800 Center Base ASSY;

c.    10,950 Axle & Rings Base ASSY.

107.    Defendants were aware of the FMF requirements for funding, and a preliminary form required that Defendants inform the customer whether any of its items or services qualified as non-U.S. content.

108.    In its response to a request for proposal, Defendant Serov indicated in the section requesting "percent non-U.S. content" that all materials had "0" percent non-U.S. content.

109.    In reality, Defendant Serov obtained tungsten cubes for the project from a supplier in China.

110.    Despite being the prime contractor in the FMF contract, Defendants procured the manufactured tungsten cubes from a non-U.S. source.

111.    Once the tungsten cubes arrived in San Diego, Defendants then shipped the materials to a factory in Tijuana, Mexico, to assemble the cubes to the magnesium and steel blanks.

112.    Defendants supplied only glue, tape, and vibratory assembly equipment to facilitate the assembly process.

113.    As part of the assembly process, Defendants directed Oscar Cruz—their Chief Operating Officer—, Plaintiff, and others to travel to Mexico to train the factory workers on how to assemble the ammunition parts, and left some of the construction materials at the factory.

114.    Defendants then supplied the materials to the Israeli government pursuant to their agreement, which was conditioned on compliance with the FMF.

115.    On information and belief, Defendants did not add value to the tungsten cubes, as required by DSCA Guidelines § 2. Defendants performed quality assurance only. The value was added through the product assembly at the factory in Mexico.

116.    On information and belief, Defendants did not perform a substantial portion of the work, as required by DSCA Guidelines § 2.

117.    At best, Defendants served as intermediaries in the transaction.  Pursuant to DSCA Guidelines § 2(D), FMF grants may not be used to compensate a procurement agent, broker, import-export firm or other intermediary unless justified by unique factors relating to the specific country needs and the country's abilities to conduct commercial contracting. *Id.* at § 2(D).  No such unique factors were present in Defendants' supply of these materials to the government of Israel.

118.    Defendants represented or caused to be represented to the United States government that the defense articles purchased under the FMF grant were manufactured and assembled in the United States.

119.    Moreover, Defendants did not accurately account for the value of all U.S. and non-U.S. content costs for the prime contractor's material, labor, and all other expenses to produce or provide the item or service.

120.    In reality, Defendants used essentially no U.S. content.

121.    Defendants received considerable profits and a gross margin of 54 percent on the contract.

122.    On information and belief, Defendants did not receive a waiver of any of the above requirements, such as an approved offshore procurement waiver.

123.    Defendants falsely represented to the DTCC in a November 2016 letter – which Defendants sent to the government – that "machining and assembly is done at [one of its] facilities in the USA[.]"

**C. Plaintiff is wrongfully terminated for reporting and refusing to cooperate with Defendants' statutory and regulatory violations.**

124.    Plaintiff is a former employee of Defendants.

125.    Plaintiff was hired in May 2016 as Accounting Manager and also held duties as Quality Manager and Operations Manager.

126.    Plaintiff initially worked at THP's San Diego facilities.

127.    While there, Plaintiff observed that Defendants had no manufacturing capacity in San Diego, despite representing to the contrary to its customers. Defendants had set up non-functioning equipment at their facility to deceive customers and inspectors.

128.    In October 2017, Plaintiff was transferred to Defendants' facilities in Wyoming.

129.    As part of his duties, Plaintiff oversaw Defendants' accounting departments. Plaintiff's duties included frequent review and analysis of the company's contracts, projects, and inventory.

130.    Additionally, for several years, Defendants designated Plaintiff to be their "empowered official," as defined in 22 C.F.R. § 120.25, and who is responsible for monitoring compliance with ITAR.

131.    In the course of his duties and employment, Plaintiff discovered that Defendants engaged in numerous practices that violated ITAR and FMF regulations, including, but not limited to, those detailed in paragraphs 73-123 of this Complaint.

132.    Plaintiff repeatedly reported these violations to Defendants and sought to obtain their compliance with the applicable regulations.

133.    But every time Plaintiff approached Defendant Serov about the issues, he was told to "keep your mouth shut and just do your job."

134.    Defendants threatened Plaintiff that he would be "fired and never work for another defense contractor during his entire career" if he continued to express concerns about the company's ongoing legal and regulatory violations.

135.    Defendant Serov frequently told Plaintiff to "just do it" and "not become an issue for us."

136.    Defendants would threaten Plaintiff with termination if he refused to cooperate with their illegal conduct.

137.    Defendants gave Plaintiff pre-packaged lines to tell inspectors and other outside entities if they ever became suspicious, and would threaten to fire him if he did not comply with their demands.

138.    In November 2018, for instance, while THP was executing a contract with Northrop Grumman to supply parts for a "Guided Multiple Launch Rocket System," Serov directed Plaintiff to falsely represent to the First Article Inspection auditor that the product THP was supplying was of United States origin.

139.    The product was, in fact, Chinese. Defendant Serov had merely purchased Chinese tungsten balls to deceive the auditor into believing that the product was manufactured in the United States.

140.    Defendants directed Plaintiff to submit documents stating that the product was made in the United States under threat of being terminated if he did not comply.

141.    Consequently, Northrop Grumman was completely unaware that the First Article Inspection involved tungsten balls not manufactured in the United States.

142.    As part of their constant practice of threats and intimidation, Defendants also threatened and retaliated against other employees who reported their ongoing misconduct. Defendants' threats and retaliation have resulted in subsequent lawsuits and settlements with these employees.

143.    At an employee meeting on or about May 2019, in the presence of defendant Serov, Plaintiff and other employees again raised their serious concerns about the ongoing ITAR violations at the company, including providing ITAR-controlled information to foreign nationals. In response, defendant Serov acknowledged that Dror Sery required a Technical Data License and stated that the issue was "being worked on."

144.    Later that month, Defendants' CFO Chris Witt contacted Plaintiff to begin the process of requesting a Technical Data License for Dror Sery. In response, Plaintiff stated that Dror Sery should not be allowed access to any defense articles. However, defendant Serov disregarded Plaintiff's concerns and asked that future ITAR matters be routed through him.

145.     Sometime in April or May 2019, Defendant Serov told another employee that Plaintiff was a "cancer" due to his ongoing reporting and concerns with the company's ITAR violations.

146.     Shortly thereafter, in June 2019, defendant Serov hired Defendant John-Patrick Batache as CEO of TPW.

147.     Defendant Serov claimed to be "stepping down" from his role as CEO of THP and TPW, but in reality continued making all relevant decisions at the company.

148.     Following the hiring of Batache, Defendants held meetings with other employees to reorganize the company's management structure.

149.     As part of these meetings, Defendants told Plaintiff that he would lose his roles as Operation and Quality Manager. Defendant Serov told Plaintiff that if he did not want to accept these organizational changes, he would no longer have a position at the company.

150.     In mid-July 2019, during a company meeting with Defendant Batache and other employees, Plaintiff again voiced his concerns that Defendants were violating ITAR by giving Dror Sery access to ITAR-controlled data and information.

151.     Defendant Batache disregarded Plaintiff's concerns, instead showing the employees an organizational chart for the company in which Plaintiff had been demoted from his position as manager.

152.     Plaintiff continued to raise his concerns over the company's ITAR violations, stating that all employees present at the meeting were witnesses and should be protected by federal whistleblower laws.

153.    Plaintiff asked Defendant Batache whether he was being demoted and constructively terminated as a result of his reporting of the ongoing illegality.

154.    Defendant Batache refused to answer and instead had Plaintiff removed from the meeting.

155.    Shortly after this incident, Plaintiff sent a detailed text message to Defendant Russell Lewis, the co-owner of THP and TPW, informing him of the ongoing issues inside the company and urging him to investigate.

156.    Plaintiff told Defendant Lewis, *inter alia*, that he had been demoted and removed from the recent company meeting after expressing concerns over ongoing ITAR violations.

157.    Defendant Lewis responded that he would "investigate and get back to you tomorrow."

158.    On information and belief, other employees also told Defendant Lewis about the ongoing issues within the company, including the pattern and practice of ITAR violations.

159.    Plaintiff never heard back from Defendant Lewis.

160.    Instead, on information and belief, Lewis and Serov arranged for Plaintiff's termination.

161.    Not long after contacting Defendant Lewis, Plaintiff received a text message from Defendant Serov stating: "George Pazos, you are hereby fired for cause. TPW will

report to the police that you have applied pressure on HR personnel to destroy company records."'

162.    Defendant Serov's claim that Plaintiff had "applied pressure on HR personnel to destroy company records" was false, and Serov knew it to be false at the time he wrote the message.

163.    Defendant Serov's text message further stated: "You are not allowed to enter the premises under no circumstances and your personal items will be collected and delivered to the address we have on file."

164.    The message concluded by stating that it was "written by Joe Sery in the presence of HR personnel."

**D. Defendants defamed Plaintiff after his retaliatory termination and continue to harass and retaliate against him to this day.**

165.    After illegally firing Plaintiff, Defendants continued to retaliate against him by falsely accusing him of crimes to third parties and law enforcement agencies.

166.    Defendant Batache told other employees that Plaintiff was a "thief" who had stolen company property and documents.

167.    Defendant Serov told employee Kyle McCurley and his wife that he had fired Plaintiff because Plaintiff was a "criminal" and that Serov would be reporting him to law enforcement.

168.    Defendant Serov told industry contacts within Northrop Grumman that Plaintiff was a "criminal" and had "committed a crime."

169.     Defendant Serov filed a false report against Plaintiff with Wyoming law enforcement authorities, causing state officers to visit a rental property belonging to Plaintiff and interrogating a tenant as to Plaintiff's whereabouts.

170.     Defendant Serov filed false reports with the Federal Bureau of Investigation against other employees who had also been fired due to their refusal to cooperate with Defendants' ongoing fraud.

171.     All of these statements were false, and Defendants knew them to be false at the time they were made.

172.     In terminating Plaintiff for reporting and seeking to remedy their ongoing fraud, and falsely accusing him of committing crimes, Defendants acted with malice, oppression, and fraud, and in conscious disregard for Plaintiff's rights and safety.

173.     Defendants' conduct was despicable and subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights.

174.     As a result of his wrongful termination and defamation, Plaintiff has suffered and continues to suffer from loss of income, diminished reputation, stress, anxiety, humiliation, and shame.

175.     To this day, Defendants continue to retaliate against and harass Plaintiff for reporting and attempting to remedy their statutory and regulatory violations.

176.     On or about May 20, 2021, Defendants filed a lawsuit in Wyoming federal court against Plaintiff—verified under penalty of perjury by Defendant Batache—falsely

accusing him of conspiracy, theft, insubordination, breach of contract, disparagement, and interference with business relations.

177.     The lawsuit alleges, *inter alia*, that Plaintiff has been "conspiring to disparage and disparaging TPW Wyoming through concentrated independent efforts, collective efforts…", that Plaintiff "acted in an insubordinate manner and engaged in active and ongoing resistance to managerial and other operations changes within TPW Wyoming", and that Plaintiff has been engaging "in unlawful business activities by illegally targeting and interfering with the business relationships of TPW Wyoming."

178.     Defendants' allegations against Plaintiff arise entirely from protected conduct, that is, Plaintiff's refusal to cooperate with their illegal behavior and his repeated attempts to remedy their ITAR, FMF, and False Claims Act violations. Defendants' allegations continue their practice of harassment and retaliation against Plaintiff for attempting to safeguard the interests of the United States.

**E. Defendant THP settles with the United States following the filing of a False Claims Act lawsuit against them.**

179.     In October 2018, relators Gregory Caputo and Global Tungsten & Powders Corporation—who did frequent business with Defendants—filed a *qui tam* lawsuit against THP in this District, alleging violations of the federal False Claims Act arising from Defendants' ITAR and FMF fraud as alleged in this Complaint.

180.     On April 8, 2021, the United States elected to intervene in the action. According to the "Notice of Election to Intervene" filed by the United States, "pursuant to

the False Claims Act, 31 U.S.C. § 3730(b)(2) and (4), the United States notified the Court of its election to intervene in this action for settlement purposes against defendant Tungsten Heavy Powder, Inc., d/b/a Tungsten Heavy Powder and Parts, Inc." The Notice further stated that "the United States, Relators, and THP entered into a settlement agreement effective April 7, 2021."

181.   On information and belief, as part of that agreement, THP agreed to pay millions of dollars to settle allegations that it had submitted false certifications to the United States regarding the origin and manufacture of defense articles procured by the Government of Israel.

182.   Defendants omitted any mention of this settlement in the lawsuit filed against Plaintiff in Wyoming.

## V.    CAUSES OF ACTION.

### FIRST CAUSE OF ACTION

**RETALIATION IN VIOLATION OF FEDERAL FALSE CLAIMS ACT**

**(31 U.S.C § 3730(h))**

**(All Defendants)**

183.   Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in the preceding paragraphs.

184.   The anti-retaliation provision of the Federal False Claims Act states: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in

the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

185.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the United States false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the United States and its contractors, grantees, and other recipients of its funds.

186.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the United States to approve and pay false and fraudulent claims.

187.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the United States, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the United States.

188.    Through the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the United States and to deceive the United States for the purpose of getting the United States to pay or allow false or fraudulent claims.

189.     The United States was unaware of the falsity of the records, statements, and claims made and submitted by Defendants, their agents, employees, and co-conspirators, and as a result thereof the United States paid money that it otherwise would not have paid.

190.     Plaintiff, as Defendants' employee, reported and sought to remedy and prevent the false claims.

191.     Defendants knew that Plaintiff was reporting, and seeking to remedy and prevent, the false claims.

192.     Defendants fired Plaintiff for reporting, and seeking to remedy and prevent, the false claims.

193.     As a result of Defendants' actions, Plaintiff suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (All Defendants)

194.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in the preceding paragraphs.

195.     Plaintiff was Defendants' employee.

196.     Defendants fired Plaintiff.

197.     Defendants fired Plaintiff because he reported and sought to remedy their statutory and regulatory violations as described in this Complaint.

198.     Plaintiff was harmed.

199.     Defendants' actions were a substantial factor in causing Plaintiff's harm.

200.     As a result of Defendants' action, Plaintiff suffered damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### DEFAMATION PER SE
### (Defendants THP, TPW, Serov, and Batache)

201.     Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in the preceding paragraphs.

202.     Defendants Serov and Batache made one or more false statements to persons other than Plaintiff, that is, Defendants told others that Plaintiff was a "thief," a "criminal", had "committed crimes," and falsely accused him to law enforcement authorities.

203.     These people reasonably understood that the statements were about Plaintiff.

204.     These people reasonably understood the statements to mean that Plaintiff was a "thief", a "criminal," and had "committed crimes."

205.     In making these false statements, Defendants acted with oppression, fraud, and malice toward Plaintiff.

206.     Defendants at a minimum failed to use reasonable care to determine the truth or falsity of the statements.

207.     Defendants THP and TPW are liable under the doctrine of respondeat superior for the defamatory statements made by Defendants Serov and Batache, as the statements were made within the scope of their employment and in the exercise of their

functions as THP and TPW employees.

208.     Defendants' statements caused damages to Plaintiff, including harm to his business, profession, and occupation, harm to his reputation, and shame, in an amount to be proven at trial.

## VI.     RELIEF REQUESTED.

209.   For general damages and compensatory damages in an amount according to proof;

210.   For punitive and exemplary damages;

211.   Civil penalties as provided by law;

212.   Monetary damages as provided by law;

213.   All relief stated in 31 U.S.C. § 3730(h)(2);

214.   Attorneys' fees;

215.   Legal interest on all damages awards from the date of judicial demand until paid;

216.   Costs of suit;

217.   And for such other and further relief as the Court may deem proper.

//

//

//

//

## VII.   JURY DEMAND

218.   Plaintiff hereby respectfully demands a jury trial on all claims alleged herein.

*s/ Timothy A. Scott*

Dated: June 21, 2021

_____

**TIMOTHY A. SCOTT**
**MICHELE A. MCKENZIE**
**NICOLAS O. JIMENEZ**

SINGLETON SCHREIBER
MCKENZIE & SCOTT, LLP
Attorneys for Plaintiff